

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FILED
CHARLOTTE, NC

JAN 1 6 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

CIVIL ACTION NO. 3:26-cv-42-MOC

Dominique R. Jackson,
                Plaintiff,

          v.

CITY OF CHARLOTTE,
 a municipal corporation;
DETECTIVE D. SUSSMAN,
individually and in her official capacity;
DETECTIVE JOHN DOE,
 individually and in his official capacity;
OFFICER CHRISTIAN CAMPBELL,
 individually and in his official capacity;
OFFICER SARAH LATIOLAIS,
 individually and in her official capacity;
NURSE JANE/JOHN DOE,
 individually and in his/her official capacity

                Defendants.

)
) COMPLAINT FOR
DAMAGES ) AND
DECLARATORY
AND
) INJUNCTIVE RELIEF
)
) JURY TRIAL DEMANDED
)
)
)
)
)
)
)
)
, )
)
)

NOW COMES Plaintiff Dominique Jackson and for this Complaint states:

1. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.), and North Carolina state law, seeking compensatory damages in the amount of SIX MILLION, EIGHT HUNDRED FIFTY-SIX THOUSAND, EIGHT HUNDRED FIFTEEN DOLLARS ($6,856,815), punitive damages in the amount of SIX MILLION, THREE HUNDRED THOUSAND DOLLARS ($6,300,000), for a total of THIRTEEN MILLION, ONE HUNDRED FIFTY-SIX THOUSAND, EIGHT HUNDRED FIFTEEN DOLLARS ($13,156,815), together with declaratory relief, injunctive relief, pre-judgment and post-judgment interest, costs, and attorney's fees.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and the events giving rise to this action occurred in this district.

## PARTIES

5. Plaintiff Dominique Jackson is an individual residing at 1113 Glenfiddich Drive, Apartment B, Charlotte, North Carolina, 28215, Mecklenburg County.

6. Defendant City of Charlotte ("City") is a municipality and political subdivision of the State of North Carolina. The City is located in Mecklenburg County, North Carolina. The City is a "public entity" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131(1). The City may be served through its chief executive officer, City Manager Marcus D. Jones, at 600 E. Fourth Street, Charlotte, NC 28202.

7. Defendant Detective D. Sussman ("Detective Sussman") was at all times relevant herein employed by the City of Charlotte as a detective with the Charlotte-Mecklenburg

Police Department and was acting under color of state law. Detective Sussman is sued in both her individual and official capacity.

8. Defendant Detective John Doe ("Detective Doe") was at all times relevant herein employed by the City of Charlotte as a detective with the Charlotte-Mecklenburg Police Department and was acting under color of state law. Plaintiff will seek leave to amend this Complaint to identify Detective Doe's true name upon completion of discovery. Detective Doe is sued in both his individual and official capacity.

9. Defendant Officer Christian Campbell ("Officer Campbell") was at all times relevant herein employed by the City of Charlotte as a police officer with the Charlotte-Mecklenburg Police Department and was acting under color of state law. Officer Campbell is sued in both his individual and official capacity.

10. Defendant Officer Sarah Latiolais ("Officer Latiolais") was at all times relevant herein employed by the City of Charlotte as a police officer with the Charlotte-Mecklenburg Police Department and was acting under color of state law. Officer Latiolais is sued in both her individual and official capacity.

11. Defendant Nurse Jane/John Doe ("Defendant Nurse") was at all times relevant herein employed by the City of Charlotte as a Sexual Assault Nurse Examiner (SANE) or medical professional and was acting under color of state law. Plaintiff will seek leave to amend this Complaint to identify Defendant Nurse's true name upon completion of discovery. Defendant Nurse is sued in both individual and official capacity.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Disabilities

12. Plaintiff has been diagnosed with schizoaffective disorder, bipolar disorder, and alogia, generalized anxiety, unspecified trauma.

13. Alogia is a communication disability characterized by poverty of speech and significant difficulty with verbal communication, particularly under stress, pressure, or in high-stakes situations.

14. Plaintiff's alogia manifests as an inability to articulate thoughts in complete

sentences, difficulty providing detailed explanations or contextual information, speaking in short phrases rather than full explanations, and severe worsening of communication ability under pressure or in confrontational situations.

15. Each of Plaintiff's conditions—schizoaffective disorder, bipolar disorder, and alogia—constitutes a "disability" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102, as each substantially limits one or more major life activities, including but not limited to communicating, thinking, concentrating, and interacting with others.

16. Plaintiff has been receiving mental health treatment through various medical professionals and facilities since at least 2008.

17. At all times relevant to this Complaint, Defendant officers and Defendant Nurse knew or should have known of Plaintiff's disabilities based on his observable symptoms, officers previously transporting plaintiff to billingsely road for mental response, his explicit statements about his mental health crisis, and his obvious communication difficulties.

## B. Initial Contact - Voluntary Encounter

18. On January 21, 2024, at approximately 4:00 AM, Defendant police officers arrived at Plaintiff's residence in Charlotte, North Carolina, to investigate allegations made against Plaintiff.

19. Officers knocked on Plaintiff's door, and Plaintiff voluntarily admitted the officers into his home.

20. Officers questioned Plaintiff about the allegations. Plaintiff cooperated fully with the investigation.

21. Plaintiff agreed to submit to a voluntary rape kit examination.

## C. Arrest and Miranda Violation

22. After the discussion inside Plaintiff's home and after agreeing to the voluntary rape kit, Plaintiff exited his home onto his porch.

23. Upon exiting, Plaintiff was immediately surrounded by multiple Defendant officers on his porch, including Detective Sussman, Detective Doe, and additional officers.

24. At this point, Plaintiff was in custody within the meaning of the Fourth Amendment and Miranda v. Arizona, 384 U.S. 436 (1966), as a reasonable person in Plaintiff's position, surrounded by multiple law enforcement officers, would not have felt free to leave or terminate the encounter and the plaintiff did not feel he could leave or cease the interaction.

25. Despite Plaintiff being in custody, none of the Defendant officers—neither Detective Sussman, Detective Doe, nor any other officers present—provided Plaintiff with Miranda warnings.

25A. Body camera footage from the porch interrogation exists and documents this constitutional violation. The footage shows Plaintiff surrounded by multiple officers, demonstrates that no Miranda warnings were given, captures the custodial interrogation, and records Plaintiff's visible distress, confusion, and impaired communication.

26. While surrounded on the porch and in custody without Miranda warnings, Defendant officers conducted a custodial interrogation of Plaintiff.

26A. The body camera footage captures Plaintiff providing short, fragmented responses consistent with his alogia disability, demonstrates his visible confusion and distress, and shows the high-pressure interrogation tactics employed by Defendants.

27. The high-pressure situation of being surrounded by multiple officers on his porch caused Plaintiff's alogia (communication disability) to "spike," making it extremely difficult and ultimately impossible for Plaintiff to communicate effectively.

28. Detective Sussman showed Plaintiff partial text messages on her phone, displaying only fragments of message conversations without full context or surrounding messages.

29. Detective Sussman pointed to a partial message reading "im tryna fuck thom" and asked Plaintiff, "What is this?"

30. Plaintiff attempted to explain that the message was one he had apologized for and had

not meant to send, and that the recipient had misunderstood his intent. His intent was in relation to a previous conversation between the parties about a woman the plaintiff had made plans with earlier that day. However, Plaintiff's severe alogia, exacerbated by the high-pressure circumstances, prevented him from articulating the full context and explanation to detectives,

31. Under pressure and unable to provide detailed explanation due to his alogia, Plaintiff stated: "I shot my shot" because that was the interpretation of one of the individuals but clarity had been given over a phone call the day of the messages.

32. Detective Doe then asked Plaintiff: "What does 'shoot your shot' mean?"

33. Plaintiff responded: "You know what 'shoot your shot' means."

34. Despite the obvious and commonly understood meaning of this colloquial phrase, Detective Doe continued to pressure Plaintiff to explain the phrase, demanding that Plaintiff provide a detailed definition.

35. Plaintiff recognized that the question required contextual explanation and nuanced response, which his alogia prevented him from providing, particularly under the high-pressure circumstances of being surrounded by officers and subjected to aggressive questioning.

36. Detective Doe continued to apply pressure, insisting that Plaintiff explain the meaning despite Plaintiff's obvious difficulty in responding.

37. Unable to resist the continued pressure and unable to articulate a nuanced explanation due to his alogia, Plaintiff provided a simplified answer: "It means I'm tryna fuck," and gave other examples.

38. Immediately after Plaintiff made this statement—a statement obtained through coercive interrogation tactics, exploitation of Plaintiff's communication disability, custodial interrogation without Miranda warnings, and presentation of incomplete evidence—officers grabbed Plaintiff and claimed to have found probable cause to arrest him.
39. Defendant officers then formally arrested Plaintiff.

40. Plaintiff's arrest was directly caused by: (a) Defendants' failure to provide Miranda warnings, which prevented Plaintiff from knowing he could remain silent; (b) Defendants' exploitation of Plaintiff's communication disability; (c) Defendants' coercive interrogation tactics; and (d) Defendants' presentation of only partial evidence while demanding explanation without full context.

## D. Transport to Police Department

41. Following the arrest, Defendant officers transported Plaintiff to Charlotte-Mecklenburg Police Department headquarters at 601 East Trade Street, Charlotte, North Carolina.

42. Throughout the transport, Plaintiff remained in custody and was not free to leave.

## E. Rape Kit Examination at Police Station

43. Upon arrival at CMPD headquarters, a rape kit examination was performed on Plaintiff at the police station.

44. During and after the rape kit examination, Plaintiff was in a room with Defendant Nurse, Detective Sussman and other officers.

45. Plaintiff remained under arrest and in custody throughout this process.

45A. Significantly, while body camera footage exists of the porch interrogation, no video or audio recording exists of the interrogation inside the police station. This selective recording—capturing the initial encounter but not the subsequent interrogation where Plaintiff disclosed his mental health crisis and requested accommodations—demonstrates a pattern of evidence preservation that favors Defendants and suggests consciousness of wrongdoing.

## F. Plaintiff's Mental State During Interrogation
46. At the time of the rape kit sampling on January 21, 2024, Plaintiff was experiencing an acute and severe mental health crisis, including: (a) Active auditory hallucinations; (b) Manic episode; (c) Severe depression; (d) Loss of contact with reality; (e) Acute suicidal

ideation; and (f) Severe alogia (communication disability preventing effective verbal communication under stress and pressure).

47. However, due to Plaintiff's severe alogia—a communication disability that prevents effective verbal communication, particularly under stress and pressure—Plaintiff was unable to articulate the specific nature and severity of his mental health symptoms to Defendant officers.

48. Plaintiff's alogia was so severe that despite experiencing hallucinations, mania, suicidal thoughts, and loss of contact with reality, he could only communicate in simple phrases and could not provide detailed explanations of his internal state.

49. Plaintiff's inability to fully disclose the severity of his mental health crisis was itself a manifestation of his communication disability and demonstrates the critical need for the accommodations he requested.

## G. First Accommodation Request - Nurse Present

50. In the room at CMPD following or during the rape kit examination, with Defendant Nurse, Detective Sussman and/or Detective Doe, and other officers present, Plaintiff explicitly stated: (a) "I'm having a mental health crisis"; (b) "What you're doing right now is wrong" (or "They did something wrong"); and (c) "I need to speak to a supervisor."

51. These statements were made in the presence of Defendant Nurse, who witnessed: (a) Plaintiff's disclosed mental health crisis; (b) Plaintiff's statement that something was "wrong"; (c) Plaintiff's explicit request for accommodation (supervisor); (d) Plaintiff's observable mental state and distress; and (e) Plaintiff's observable communication difficulties.

52. Despite Plaintiff's explicit disclosure of a "mental health crisis," despite his explicit request for accommodation (supervisor), despite his statement that something was "wrong," and despite the presence of a medical professional who could observe his condition, Defendants: (a) Denied Plaintiff's request to speak with a supervisor; (b) Sent additional officers into the room to question Plaintiff about why he wanted to speak with
a supervisor, thereby applying additional pressure and scrutiny to Plaintiff's

accommodation request; (c) Failed to inquire about the nature of Plaintiff's mental health crisis; (d) Failed to contact mental health crisis services; (e) Failed to arrange for mental health evaluation; and (f) Placed Plaintiff back into interrogation room for continued questioning.

53. After denying Plaintiff's accommodation request, Defendant officers placed Plaintiff into an interrogation room.

54. Plaintiff was uncuffed in the interrogation room.

## H. Second Accommodation Request - Interrogation Room

55. While Plaintiff was in the interrogation room, Defendants Officer Campbell and Officer Latiolais came into the room.

56. Plaintiff, still experiencing his severe mental health crisis, again explicitly stated to these officers: (a) "I'm uncomfortable talking to you"; (b) "I'm having a mental health crisis"; and (c) "I need to speak to a supervisor."

57. Despite this second explicit disclosure of mental health crisis and second explicit request for accommodation, Officers Campbell and Latiolais also denied Plaintiff's request for a supervisor.

58. At no time did any supervisor come to speak with Plaintiff despite his two explicit requests.

59. At no time did any Defendant officer provide any accommodation for Plaintiff's communication disability (alogia) or mental health crisis.

60. At no time did any Defendant officer offer alternative communication methods (such as written communication, additional time to process questions, or a less pressured environment) despite Plaintiff's obvious and disclosed communication difficulties.

61. At no time did any Defendant officer contact mental health crisis services or arrange for mental health evaluation despite Plaintiff's repeated disclosures that he was experiencing a "mental health crisis."

62. At no time did any Defendant officer inquire about the nature of Plaintiff's mental health crisis or attempt to ascertain whether he needed immediate medical attention.

## I. Defendant Nurse's Complete Failure to Act

63. Defendant Nurse, as a medical professional and Sexual Assault Nurse Examiner employed by the City of Charlotte, had professional duties to: (a) Assess a patient who states "I'm having a mental health crisis"; (b) Inquire about the nature of the disclosed mental health crisis; (c) Advocate for appropriate medical care and evaluation; (d) Ensure that interrogation or other procedures do not continue during a medical crisis; (e) Contact mental health crisis services when a patient discloses mental health crisis; (f) Document observed mental health concerns; and (g) Intervene when a patient states that "something is wrong."

64. Defendant Nurse breached each of these professional duties by: (a) Witnessing Plaintiff's mental health crisis disclosure and taking no action; (b) Hearing Plaintiff's request for supervisor and remaining silent; (c) Hearing Plaintiff state "something is wrong" without any intervention; (d) Observing Plaintiff's communication difficulties without advocating for accommodations; (e) Allowing interrogation to continue despite observable mental health crisis; (f) Failing to document or report serious mental health concerns; and (g) Prioritizing law enforcement investigation over patient care and safety.

65. A reasonably prudent medical professional in Defendant Nurse's position would have recognized Plaintiff's disclosed "mental health crisis" as requiring immediate assessment, would have inquired about the nature of the crisis, would have advocated for mental health evaluation, and would have intervened to ensure Plaintiff's medical needs were addressed before any further interrogation.

## J. Observable Manifestations of Plaintiff's Crisis

66. Even without Plaintiff's full disclosure of specific symptoms (which his alogia prevented), Plaintiff's mental health crisis was observable to Defendants through: (a) Plaintiff's explicit statement: "I'm having a mental health crisis"; (b) Plaintiff's statement: "I'm uncomfortable talking to you"; (c) Plaintiff's statement: "Something is wrong"; (d) Plaintiff's obvious communication difficulties and breakdown; (e) Plaintiff's "spiked" alogia making effective communication impossible; (f) Plaintiff's visible distress and

discomfort; (g) Plaintiff's repeated requests for someone else (supervisor) to intervene; and (h) Defendant Nurse's observations as a medical professional.

67. A reasonable officer or medical professional would recognize that someone explicitly stating "I'm having a mental health crisis" requires immediate mental health evaluation and should not be subjected to continued interrogation without appropriate accommodations and mental health intervention.

## K. Jail Placement in Medical Section - Institutional Corroboration

68. Following the events at the police department, Plaintiff was transported to Mecklenburg County Jail.

69. Upon intake at the jail, Plaintiff was placed in the medical section of the jail rather than the general population.

70. Plaintiff's placement in the jail medical section demonstrates that: (a) Plaintiff's mental health crisis was observable to jail intake staff; (b) Plaintiff's condition was serious enough to require medical-level monitoring and specialized housing; (c) Institutional recognition of Plaintiff's mental health crisis existed; and (d) Plaintiff's mental state required intervention beyond standard detention.

71. If jail intake staff, after brief observation, recognized that Plaintiff's condition was serious enough to warrant medical section placement, then Defendant officers and Defendant Nurse, who had been with Plaintiff for hours and who received explicit disclosures of his "mental health crisis," had even more reason to recognize and respond to his serious medical needs.

## L. Spoliation of Evidence

72. Electronic evidence, including complete text message threads, is critical to understanding the context that Plaintiff, due to his communication disability (alogia), was unable to articulate during the coercive interrogation.

73. During the porch interrogation, Detective Sussman showed Plaintiff partial text messages on her phone, displaying only fragments of conversations without full context

or surrounding messages.

74. Plaintiff, due to his alogia which "spiked" under the high-pressure circumstances, was unable to explain the context of these partial messages.

75. The complete, unredacted message threads would demonstrate the context that Plaintiff's disability prevented him from articulating, and would likely be exculpatory.

76. In discovery in the related criminal case, Detective Sussman stated that she submitted a "preservation request" for electronic evidence.

77. However, Detective Sussman has failed to produce: (a) The date of the alleged preservation request; (b) The time of the alleged preservation request; (c) A copy of the preservation request itself; (d) Documentation of to whom the request was sent; (e) Documentation of the method by which the request was sent; (f) Proof that the preservation request was actually sent; (g) Any response to the preservation request; or (h) The complete, unredacted message threads that were the subject of the preservation request.

78. The failure to produce documentation of the preservation request suggests that either: (a) no preservation request was actually sent; (b) the preservation request was sent too late and evidence was already destroyed; or (c) the preservation request exists but is being concealed.

79. Upon information and belief, Defendants knew or should have known that litigation was likely as of January 21, 2024, when they arrested Plaintiff.

80. Upon information and belief, Defendants had a duty to preserve all evidence, including complete message threads, as of that date.

81. Upon information and belief, Defendants failed to preserve complete message threads, and such evidence has been lost, destroyed, or is being concealed.

82. The loss, destruction, or concealment of complete message threads constitutes spoliation of evidence.

83. The spoliation of evidence demonstrates consciousness of wrongdoing and supports

an inference that Defendants knew their conduct was unlawful.

## M. Consequences and Harm

84. As a direct result of Defendants' conduct—including their Miranda violation, their failure to accommodate Plaintiff's disability, their continuation of interrogation despite his disclosed crisis, their denial of his accommodation requests, their coercive interrogation tactics, and their exploitation of his communication disability—Plaintiff's mental health crisis was severely exacerbated.

85. Following the interrogation and arrest, Plaintiff: (a) Attempted suicide on multiple occasions; (b) Experienced severe worsening of pre-existing mental health conditions; (c) Continues to require intensive mental health treatment including Assertive Community Treatment (ACT) team services; (d) Suffers ongoing psychological trauma; (e) Experiences severe anxiety and fear of law enforcement; (f) Has been unable to maintain employment due to the severity of his mental health deterioration; and (g) Continues to face criminal prosecution based on statements obtained through the constitutional violations described herein.

86. The exacerbation of Plaintiff's mental health crisis, including his subsequent suicide attempts, was a direct and foreseeable result of Defendants' decision to continue interrogating Plaintiff despite his disclosed crisis, to deny him the accommodations he explicitly requested, to exploit his communication disability, and to prioritize obtaining statements over Plaintiff's immediate safety and medical needs.

## N. Ongoing Criminal Prosecution Based on Unconstitutionally Obtained Statements and a warrant

87. As a direct and proximate result of Defendants' constitutional violations described herein, Plaintiff continues to face criminal prosecution in Mecklenburg County Superior Court.

88. The criminal charges against Plaintiff are based entirely or substantially on statements obtained through the violations of Plaintiff's constitutional rights, including: (a) Statements obtained during custodial interrogation without Miranda warnings in violation of the Fifth Amendment; (b) Statements obtained through exploitation of Plaintiff's communication disability in violation of the ADA; (c) Statements obtained through

coercive interrogation tactics in violation of the Fourteenth Amendment Due Process Clause; and (d) Statements obtained from an individual in an obvious mental health crisis without medical evaluation or intervention and (c) a warrant to search the plaintiffs phone

89. The body camera footage from the porch interrogation, which documents the Miranda violation and Plaintiff's observable disability-related communication impairment, exists and is available to both the criminal prosecution and this Court.

90. As of the filing of this Complaint, the criminal prosecution remains pending, and the statements obtained through Defendants' constitutional violations have not been suppressed by the criminal court.

91. The ongoing criminal prosecution causes Plaintiff continuing and additional harm, including but not limited to:
(a) Ongoing legal expenses, stress, and anxiety related to defending against charges based on unconstitutionally obtained evidence;
(b) Inability to obtain or maintain employment due to pending criminal charges, resulting in ongoing lost wages and economic harm;
(c) Damage to Plaintiff's reputation in the community;
(d) Restriction on Plaintiff's liberty through bond conditions and court-ordered requirements;
(e) Ongoing emotional distress and trauma from prolonged legal proceedings;
(f) Exacerbation of Plaintiff's pre-existing mental health conditions, including schizoaffective disorder, bipolar disorder, and anxiety;
(g) Interference with Plaintiff's mental health treatment and recovery; (h) Fear and uncertainty about potential incarceration based on tainted evidence.

92. The criminal prosecution serves as a continuing reminder of the constitutional violations Plaintiff suffered on January 21, 2024, and prolongs the harm caused by Defendants' unconstitutional conduct.

93. Should Plaintiff be convicted based on statements obtained through the constitutional violations described herein, such conviction would itself constitute additional harm directly flowing from Defendants' unconstitutional conduct and would further damage Plaintiff beyond the harms already suffered.
94. Alternatively, should the criminal charges be dismissed or should Plaintiff be

acquitted, such outcome would demonstrate that Plaintiff's arrest was based on insufficient or tainted evidence, further supporting Plaintiff's claims that Defendants manufactured probable cause through constitutional violations.

95. The pendency of the criminal prosecution demonstrates the continuing nature of the harm caused by Defendants' conduct and supports Plaintiff's claims for substantial compensatory and punitive damages.

## CLAIMS FOR RELIEF

COUNT I
AMERICANS WITH DISABILITIES ACT, TITLE II
Failure to Provide Reasonable Modifications
42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)
(Against All Defendants)

87. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Title II of the Americans with Disabilities Act provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

89. Implementing regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

90. Defendant City of Charlotte is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1).

91. Plaintiff is a "qualified individual with a disability" within the meaning of the ADA, as he has disabilities (schizoaffective disorder, bipolar disorder, and alogia) that substantially limit one or more major life activities, including communicating, thinking, concentrating, and interacting with others.

92. Interrogation by law enforcement is a "service, program, or activity" of a public entity within the meaning of Title II of the ADA.

93. Plaintiff explicitly requested a reasonable modification—specifically, to speak with a supervisor—to accommodate his communication disability and mental health crisis.

94. The requested modification (providing a supervisor) was reasonable and would have: (a) Given Plaintiff access to someone with more training and experience in handling individuals with disabilities; (b) Potentially slowed down the pace of questioning to accommodate Plaintiff's communication processing difficulties; (c) Provided oversight of the interrogation to ensure disability accommodations were made; (d) Reduced the high-pressure environment that was causing Plaintiff's alogia to "spike"; and (e) Ensured that Plaintiff's mental health crisis was properly evaluated and addressed.

95. The requested modification would not have fundamentally altered the nature of the law enforcement investigation, as police supervisors routinely participate in interrogations and can conduct interviews that serve law enforcement purposes while accommodating individuals with disabilities.

96. Despite Plaintiff's explicit request for this reasonable modification, Defendants: (a) Denied Plaintiff's request; (b) Never provided access to any supervisor; and (c) Continued the interrogation without any modifications to accommodate Plaintiff's disabilities.

97. Plaintiff requested the modification on two separate occasions, to different officers (first to Detective Sussman and other officers with Defendant Nurse present, then to Officers Campbell and Latiolais), and was denied both times.

98. The failure to provide the requested modification was not based on any determination that the modification would fundamentally alter the law enforcement activity, but rather was a blanket denial without consideration of Plaintiff's disability needs.

99. As a result of Defendants' failure to provide reasonable modifications, Plaintiff was denied meaningful access to and was discriminated against in the interrogation process, in violation of Title II of the ADA.
100. Defendants' failure to provide reasonable modifications directly caused Plaintiff's arrest, as Plaintiff's inability to communicate effectively due to his unaccommodated

alogia resulted in simplified statements that were used as probable cause for arrest.

101. A nurse was present in the room and witnessed Plaintiff's request for accommodation, heard Plaintiff's disclosure of mental health crisis, and observed Defendant officers' denial of the request. The presence of a medical professional who could corroborate Plaintiff's mental state makes Defendants' denial of accommodation even more egregious.

102. As a direct and proximate result of Defendants' violations of Title II of the ADA, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT II
AMERICANS WITH DISABILITIES ACT, TITLE II
Failure to Provide Effective Communication
42 U.S.C. § 12132; 28 C.F.R. § 35.160
(Against All Defendants)

103. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

104. Title II of the ADA requires public entities to ensure that communications with individuals with disabilities are as effective as communications with others. 28 C.F.R. § 35.160(a)(1).

105. Public entities must furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities an equal opportunity to participate in and benefit from the public entity's services, programs, or activities. 28 C.F.R. § 35.160(b)(1).

106. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. 28 C.F.R. § 35.160(b)(2).

107. Plaintiff has alogia, a communication disability that substantially limits his ability to communicate verbally, particularly under stress and pressure.
108. The high-pressure circumstances of being surrounded by officers and subjected to custodial interrogation caused Plaintiff's alogia to "spike," making effective verbal

communication extremely difficult and ultimately impossible.

108A. Body camera footage from the porch interrogation visually documents Plaintiff's communication impairment, showing his short, fragmented responses, visible confusion, and distress—all consistent with alogia symptoms being exacerbated by the high-pressure interrogation environment.

109. Despite Plaintiff's obvious communication difficulties and his explicit disclosure of a "mental health crisis," Defendants: (a) Continued to rely exclusively on verbal interrogation methods; (b) Failed to provide any alternative means of communication (such as written communication, additional processing time, or reduced-pressure environment); (c) Failed to give primary consideration to Plaintiff's request for a supervisor, which was Plaintiff's requested accommodation; and (d) Applied pressure tactics that further exacerbated Plaintiff's communication disability.

110. Plaintiff's alogia was so severe that despite experiencing hallucinations, mania, suicidal ideation, and loss of contact with reality, he could only articulate "I'm having a mental health crisis." This demonstrates both the severity of his communication disability and the critical need for alternative communication methods.

111. If Defendants had provided appropriate auxiliary aids and services—such as allowing Plaintiff to write responses, providing additional time to process questions, reducing the pressure of the interrogation environment, or granting Plaintiff's request to speak with a supervisor—Plaintiff might have been able to articulate the full nature of his mental health crisis and provide proper context for the partial messages shown to him.

112. Defendants' communication with Plaintiff was not as effective as their communications with individuals without communication disabilities would have been, as Plaintiff was unable to effectively explain his situation, provide contextual information, or articulate his needs due to his unaccommodated alogia.

113. Despite the presence of Defendant Nurse—a medical professional who could observe Plaintiff's communication difficulties—Defendants made no effort to provide alternative communication methods or to modify their verbal interrogation approach.
114. As a result of Defendants' failure to provide effective communication, Plaintiff was denied meaningful access to and was discriminated against in the interrogation process,

in violation of Title II of the ADA.

115. As a direct and proximate result of Defendants' violations of Title II of the ADA, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT III
AMERICANS WITH DISABILITIES ACT, TITLE II
Discrimination Based on Disability
42 U.S.C. § 12132; 28 C.F.R. § 35.130(a)
(Against All Defendants)

116. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

117. Title II of the ADA provides: "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

118. Implementing regulations provide: "A public entity, in providing any aid, benefit, or service, may not... (7) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(vii).

119. Plaintiff was treated differently than similarly situated individuals without disabilities would have been treated in the same interrogation circumstances.

120. An individual without alogia or communication disabilities would have been able to: (a) Articulate the full context and explanation for the partial messages shown by Detective Sussman; (b) Provide nuanced responses to questions; (c) Effectively communicate their mental state; and (d) More likely avoid arrest based on misunderstood or oversimplified statements.

121. Plaintiff's disabilities were the direct cause of his differential treatment, as his alogia prevented him from providing the same type of responses that a non-disabled individual could have provided.

122. Defendants deliberately exploited Plaintiff's communication disability by: (a) Continuing to use exclusively verbal interrogation despite obvious communication breakdown; (b) Applying pressure tactics that worsened his alogia; (c) Demanding detailed explanations that they knew or should have known his disability prevented him from providing; and (d) Using the simplified statements resulting from his disability as basis for arrest.

123. As a result of this disability-based discrimination, Plaintiff was excluded from meaningful participation in the interrogation process and was denied the benefits of a fair interrogation that non-disabled individuals receive.

124. As a direct and proximate result of Defendants' violations of Title II of the ADA, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT IV
42 U.S.C. § 1983
VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS
Coercive Interrogation
(Against Individual Defendants)

125. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

126. The Fourteenth Amendment's Due Process Clause prohibits law enforcement from using coercive interrogation tactics that overcome an individual's will.

127. An interrogation is coercive when, considering the totality of the circumstances, the tactics used by law enforcement officers are so manipulative or coercive that they deprive the defendant of his ability to make an unconstrained, autonomous decision to confess.

128. Defendant officers employed coercive interrogation tactics including: (a) Surrounding Plaintiff with multiple officers creating a physically intimidating environment; (b) Showing Plaintiff only partial text messages without complete context,
thereby misleading him about the evidence; (c) Asking questions to which Defendants

clearly already knew the answers (e.g., "What does 'shoot your shot' mean?") for the purpose of pressuring Plaintiff rather than seeking information; (d) Applying sustained pressure when Plaintiff attempted to decline to answer or indicated difficulty answering; (e) Deliberately exploiting Plaintiff's known communication disability (alogia) to obtain simplified statements; (f) Continuing interrogation after Plaintiff disclosed he was having a "mental health crisis"; (g) Denying Plaintiff's explicit requests for accommodation (supervisor) which would have reduced the coercive pressure; and (h) Maintaining custody and control over Plaintiff throughout the process without ever informing him of his rights.

129. These coercive tactics were applied to Plaintiff while he was experiencing a severe mental health crisis that included hallucinations, mania, depression, loss of contact with reality, and severe alogia, all of which made him particularly vulnerable to coercion.

130. The combination of these coercive tactics, applied to an individual with known communication disabilities and in a disclosed mental health crisis, rendered Plaintiff's statements involuntary within the meaning of the Due Process Clause.

131. Defendant officers knew or should have known that their tactics were coercive and would overcome Plaintiff's will, particularly given his disclosed mental health crisis and obvious communication difficulties.

132. The statements obtained through this coercive interrogation were then used as the basis for Plaintiff's arrest, directly causing him harm.

133. As a direct and proximate result of Defendants' use of coercive interrogation tactics in violation of the Fourteenth Amendment, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT V
42 U.S.C. § 1983
VIOLATION OF FOURTH AMENDMENT
Unreasonable Seizure
(Against Individual Defendants)
134. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

135. The Fourth Amendment prohibits unreasonable seizures of persons.

136. Plaintiff was seized within the meaning of the Fourth Amendment when he was surrounded by multiple officers on his porch and was not free to leave.

137. The seizure became prolonged custody when Plaintiff was formally arrested and transported to CMPD headquarters.

138. A seizure is unreasonable when it lacks probable cause or when the manner of the seizure is unreasonable given the circumstances.

139. Plaintiff's arrest and seizure were unreasonable because: (a) They were based on statements obtained in violation of Miranda v. Arizona; (b) They were based on statements obtained through exploitation of Plaintiff's communication disability; (c) They were based on statements obtained through coercive interrogation tactics; (d) They were based on statements obtained from an individual in an obvious mental health crisis without appropriate medical evaluation; (e) The probable cause for arrest was manufactured through constitutional violations rather than lawful investigation; and (f) The manner of seizure—surrounding a vulnerable individual experiencing mental health crisis, exploiting his disability, and continuing custody despite his requests for accommodation—was unreasonable.

140. An arrest that is based entirely on statements obtained through constitutional violations (here, Miranda violation, ADA violations, and coercive interrogation) lacks valid probable cause.

141. The doctrine of "fruit of the poisonous tree" requires exclusion of evidence obtained through prior constitutional violations. Here, Plaintiff's arrest was the direct fruit of the Miranda violation, ADA violations, and coercive interrogation.

142. Even if some minimal basis for investigation existed prior to the porch interrogation, Defendant officers' decision to conduct a custodial interrogation without Miranda warnings, without disability accommodations, and using coercive tactics, tainted any probable cause that might have developed.

143. As a direct and proximate result of Defendants' unreasonable seizure in violation of

the Fourth Amendment, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT VI
42 U.S.C. § 1983
VIOLATION OF FIFTH AMENDMENT
Custodial Interrogation Without Miranda Warnings
(Against Individual Defendants)

144. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

145. The Fifth Amendment, as applied to the states through the Fourteenth Amendment, protects individuals from being compelled to incriminate themselves.

146. In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that law enforcement officers must inform individuals of their constitutional rights—including the right to remain silent and the right to counsel—before conducting custodial interrogation.

147. Plaintiff was in custody within the meaning of Miranda when he was surrounded by multiple officers on his porch and a reasonable person in his position would not have felt free to leave or terminate the encounter.

148. Defendant officers conducted custodial interrogation of Plaintiff while he was surrounded on his porch, asking him questions designed to elicit incriminating responses.

148A. Body camera footage of this porch interrogation exists and documents this constitutional violation. The footage shows Plaintiff in obvious custody, surrounded by multiple officers, and being subjected to interrogation without having been advised of his Miranda rights.

149. At no time did any Defendant officer provide Plaintiff with Miranda warnings prior to or during this custodial interrogation.

150. Defendant officers never informed Plaintiff that: (a) He had the right to remain silent; (b) Anything he said could be used against him; (c) He had the right to an attorney; or (d) An attorney would be appointed for him if he could not afford one.

151. Because Plaintiff was not given Miranda warnings, he did not know he could refuse to answer questions or terminate the interrogation.

152. The failure to provide Miranda warnings was particularly egregious given that: (a) Plaintiff was experiencing a severe mental health crisis including hallucinations, mania, and loss of contact with reality; (b) Plaintiff had a communication disability (alogia) that prevented him from effectively understanding or responding to questions; and (c) Even if Miranda warnings had been given, Plaintiff's mental state and communication disability would have prevented him from making a knowing, voluntary, and intelligent waiver of his Miranda rights.

153. When Plaintiff requested to speak with a supervisor, this constituted an ambiguous invocation of rights that should have required officers to cease questioning or clarify Plaintiff's request. Instead, officers denied the request and continued interrogation.

154. The statements obtained from Plaintiff during this custodial interrogation without Miranda warnings were used as the sole basis for his arrest.

155. Plaintiff's arrest was directly caused by the Miranda violation. If Defendant officers had provided Miranda warnings as required by law, Plaintiff would have been informed of his right to remain silent and his right to counsel, and he could have invoked those rights, avoiding the coercive interrogation that led to his arrest.

156. The causal connection between the Miranda violation and Plaintiff's arrest is direct and undisputed: No Miranda warnings → Coercive interrogation continued → Plaintiff gave simplified statements due to alogia → Officers used those statements as probable cause → Plaintiff arrested.

157. As a direct and proximate result of Defendants' violation of Miranda and the Fifth Amendment, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT VII
42 U.S.C. § 1983
VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS
Deliberate Indifference to Serious Medical Needs

(Against All Individual Defendants)

158. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

159. The Fourteenth Amendment's Due Process Clause prohibits deliberate indifference to a person's serious medical needs.

160. A mental health crisis constitutes a serious medical need requiring prompt medical attention.

161. Plaintiff explicitly disclosed to Defendant officers: "I'm having a mental health crisis."

162. This disclosure put Defendants on notice of Plaintiff's serious medical needs.

163. A "mental health crisis" is inherently serious and requires immediate medical evaluation, as any reasonable officer or medical professional would understand.

164. Defendants were deliberately indifferent to Plaintiff's serious medical needs, as evidenced by: (a) Never inquiring about the nature of Plaintiff's mental health crisis; (b) Never contacting mental health crisis services; (c) Never arranging for mental health evaluation; (d) Continuing interrogation despite the disclosed crisis; (e) Denying Plaintiff's requests for accommodation (supervisor) which might have led to appropriate medical intervention; (f) Applying pressure tactics that exacerbated the crisis; and (g) Prioritizing obtaining statements over Plaintiff's immediate medical needs.

165. Defendant Nurse, as a medical professional, was present when Plaintiff disclosed his mental health crisis and had a professional duty to assess and intervene. Defendant Nurse's complete failure to act constitutes deliberate indifference.

166. Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety by continuing interrogation of an individual in mental health crisis without medical evaluation or intervention.

167. The serious medical need (mental health crisis) was obvious to Defendants based

on: (a) Plaintiff's explicit statement; (b) Plaintiff's observable distress; (c) Plaintiff's communication breakdown; (d) Plaintiff's repeated requests for help (supervisor); and (e) The subsequent recognition by jail intake staff that Plaintiff required medical section placement.

168. Defendants' deliberate indifference directly caused harm to Plaintiff, as the exacerbated mental health crisis led to suicide attempts, psychiatric hospitalizations, and ongoing severe psychological trauma.

169. As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's serious medical needs in violation of the Fourteenth Amendment, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT VIII
42 U.S.C. § 1983
VIOLATION OF FOURTEENTH AMENDMENT
Equal Protection
(Against Individual Defendants)

170. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

171. The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person the equal protection of the laws.

172. Plaintiff was treated differently than similarly situated individuals without disabilities.

173. Defendants' differential treatment of Plaintiff was based on his disabilities (schizoaffective disorder, bipolar disorder, and alogia).

174. There was no rational basis for treating Plaintiff differently than non-disabled individuals in similar interrogation circumstances.

175. By denying Plaintiff the same opportunities to effectively communicate and participate in the interrogation process that are afforded to non-disabled individuals, Defendants violated the Equal Protection Clause.

176. As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT IX
42 U.S.C. § 1983
MONELL MUNICIPAL LIABILITY
Policies, Customs, and Practices
(Against City of Charlotte)

177. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

178. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality may be held liable under § 1983 when a constitutional violation is caused by a municipal policy, custom, or practice.

179. Defendant City of Charlotte had policies, customs, or practices that caused the constitutional violations suffered by Plaintiff, including:

POLICY/CUSTOM #1: FAILURE TO ACCOMMODATE INDIVIDUALS WITH DISABILITIES

180. Upon information and belief, the City of Charlotte has a policy, custom, or practice of failing to provide reasonable accommodations to individuals with disabilities during interrogations and other law enforcement encounters.

181. This policy or custom is evidenced by: (a) Multiple officers (Detective Sussman, Detective Doe, Officer Campbell, Officer Latiolais) all denying Plaintiff's accommodation requests, suggesting systematic rather than isolated failure; (b) No officer at any point suggesting any alternative accommodation; (c) No supervisory intervention despite two requests; (d) Upon information and belief, lack of written policies requiring accommodation of disabilities during interrogations; and (e) Upon information and belief, lack of training on ADA Title II requirements.
POLICY/CUSTOM #2: INADEQUATE TRAINING

182. Upon information and belief, Defendant City of Charlotte failed to adequately train officers on: (a) ADA Title II requirements; (b) Recognizing and accommodating communication disabilities such as alogia; (c) Responding to requests for reasonable accommodations; (d) Miranda requirements for custodial interrogations; (e) Recognizing and responding to mental health crises; (f) When to cease interrogation for medical or safety reasons; and (g) Crisis Intervention Training (CIT) techniques.

183. The failure to train is evidenced by: (a) Officers' failure to recognize obvious custody situation requiring Miranda warnings; (b) Officers' failure to recognize or respond appropriately to disclosed mental health crisis; (c) Officers' failure to understand ADA obligations; (d) Nurse's failure to perform basic professional duties; and (e) Multiple officers all making the same fundamental errors.

184. The need for training on these topics was obvious given that: (a) The ADA has been law since 1990 (over 30 years); (b) Miranda has been law since 1966 (over 55 years); (c) Interactions with individuals with mental illness and disabilities are common in law enforcement; and (d) The City of Charlotte had or should have had notice of prior similar incidents.

POLICY/CUSTOM #3: INADEQUATE SUPERVISION

185. Defendant City of Charlotte failed to adequately supervise officers conducting interrogations of individuals with disabilities and mental health crises.

186. This failure is evidenced by: (a) No supervisor responded to Plaintiff's two explicit requests to speak with a supervisor; (b) No supervisory review of decisions to deny accommodation requests; (c) No supervisory monitoring of high-risk interrogation (individual in mental health crisis); and (d) Officers operated without any supervisory oversight despite obvious red flags.

Also this is evidence as the two officers who entered the interrogation rom to pressure the plaintiff stated that no supervisor was on duty at the time the plaintiff requested one.

POLICY/CUSTOM #4: FAILURE TO IMPLEMENT ADA COMPLIANCE SYSTEMS
187. Upon information and belief, Defendant City of Charlotte failed to implement

systems for ADA compliance, including: (a) No protocol for responding to accommodation requests; (b) No requirement for supervisory notification when accommodation requested; (c) No documentation requirements for accommodation requests and denials; (d) No process for evaluating whether modification is reasonable; and (e) No system for providing alternative communication methods.

DELIBERATE INDIFFERENCE

188. Defendant City of Charlotte was deliberately indifferent to the constitutional rights of individuals with disabilities by: (a) Failing to train despite obvious need; (b) Failing to implement policies despite longstanding legal requirements; (c) Failing to supervise despite foreseeable risks; and (d) Upon information and belief, failing to discipline or correct officers after prior violations.

CAUSATION

189. These policies, customs, and practices directly caused the violations of Plaintiff's constitutional rights.

190. If proper training had been provided, officers would have known to provide Miranda warnings, accommodate disabilities, and respond to mental health crises.

191. If proper policies had been in place, Plaintiff's requests for accommodation would have triggered supervisory review and likely would have been granted.

192. If proper supervision had existed, a supervisor would have responded to Plaintiff's requests and intervened.

193. As a direct and proximate result of Defendant City of Charlotte's policies, customs, and practices, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT X
42 U.S.C. § 1983
FAILURE TO INTERVENE
(Against All Individual Defendants)

194. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

195. Law enforcement officers have an affirmative duty to intervene to prevent other officers from violating an individual's constitutional rights.

196. Medical professionals employed by law enforcement have a duty to intervene to protect patients from harm.

197. Multiple Defendant officers were present during the various constitutional violations and had opportunities to intervene:

(a) ON THE PORCH: Multiple officers including Detective Sussman, Detective Doe, and others were present during the custodial interrogation without Miranda warnings. Each officer who was present had a duty to intervene to ensure Miranda warnings were provided. None intervened.

(b) AT CMPD WITH NURSE: Detective Sussman, Detective Doe, other officers, and Defendant Nurse were present when Plaintiff disclosed his mental health crisis, requested accommodation (supervisor), and stated "something is wrong." Each had a duty to intervene to ensure Plaintiff received medical evaluation and that his accommodation request was honored. None intervened.

(c) INTERROGATION ROOM: Officers Campbell and Latiolais were present when Plaintiff made his second accommodation request. They knew of the prior denial and had a duty to intervene to ensure accommodation was provided. They failed to intervene and instead themselves denied the request.

198. Each Defendant who witnessed constitutional violations and failed to intervene is independently liable under § 1983.

199. Defendant Nurse, as a medical professional, had a particular duty to intervene to protect her patient's health and advocate for appropriate medical care. Her complete failure to act when witnessing Plaintiff's disclosed crisis and the denial of his accommodation request constitutes failure to intervene.

200. As a direct and proximate result of Defendants' failure to intervene, the

constitutional violations continued and Plaintiff suffered damages as set forth below.

COUNT XI
42 U.S.C. § 1983
VIOLATION OF SUBSTANTIVE DUE PROCESS
State-Created Danger Doctrine
(Against Individual Defendants)

201. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

202. The Fourteenth Amendment's Due Process Clause protects individuals from government actors who affirmatively create or increase a danger that leads to harm.

203. To establish liability under the state-created danger doctrine, Plaintiff must show: (a) Defendant officers created or increased the danger to Plaintiff; (b) The danger was foreseeable; (c) Defendant officers acted with deliberate indifference; and (d) The danger materialized causing harm.

204. Defendant officers created and/or substantially increased the danger to Plaintiff by: (a) Continuing custodial interrogation after Plaintiff disclosed he was experiencing a "mental health crisis"; (b) Continuing interrogation using high-pressure coercive tactics on a person in mental health crisis; (c) Denying Plaintiff's requests for accommodation (supervisor) that would have reduced the danger; (d) Refusing to contact mental health crisis services; (e) Refusing to arrange mental health evaluation; (f) Exploiting Plaintiff's communication disability; and (g) Prioritizing obtaining statements over Plaintiff's safety.

205. Interrogation is inherently stressful and pressure-filled. Applying interrogation pressure to a person who has disclosed they are experiencing a "mental health crisis" substantially increases the risk of harm to that person's mental and physical health.

206. The danger to Plaintiff was foreseeable. Any reasonable officer knows that continuing to interrogate someone who states "I'm having a mental health crisis" creates risk of exacerbating that crisis and causing serious psychological harm.

207. Defendant Nurse, as a medical professional, knew or should have known that continuing interrogation of a patient in mental health crisis creates substantial danger to

that patient's wellbeing.

208. Defendant officers and Defendant Nurse acted with deliberate indifference to the known and substantial risk of serious harm to Plaintiff by consciously disregarding his disclosed crisis and continuing the dangerous conduct.

209. The danger created by Defendants materialized when Plaintiff's mental health crisis was severely exacerbated, leading directly to: (a) Multiple suicide attempts; (b) Psychiatric hospitalizations; (c) Severe worsening of mental health conditions; (d) Need for intensive ACT team services; and (e) Ongoing psychological trauma.

210. There is a direct causal link between Defendants' conduct (continued high-pressure interrogation of an individual in disclosed mental health crisis without accommodations or medical intervention) and Plaintiff's harm (suicide attempts and severe crisis exacerbation).

211. As a direct and proximate result of Defendants' creation and increase of danger to Plaintiff in violation of substantive due process, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XII
AMERICANS WITH DISABILITIES ACT
RETALIATION
42 U.S.C. § 12203
(Against All Defendants)

212. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

213. The ADA prohibits retaliation against individuals for opposing practices made unlawful by the ADA or for requesting reasonable accommodations. 42 U.S.C. § 12203.

214. Plaintiff engaged in protected activity when he requested a reasonable accommodation by asking to speak with a supervisor.

215. After Plaintiff made his first request for accommodation, Defendant officers engaged in adverse actions including: (a) Sending additional officers into the room to

question Plaintiff about why he wanted to speak with a supervisor; (b) Applying additional pressure and scrutiny to Plaintiff's accommodation request; (c) Denying the accommodation request; and (d) Placing Plaintiff back in interrogation room.

216. When Plaintiff made his second request for accommodation to Officers Campbell and Latiolais, Defendants again denied the request and continued interrogation, constituting further retaliation.

217. These actions constitute retaliation because they were adverse actions taken in response to Plaintiff's protected activity (requesting accommodation) and would dissuade a reasonable person from requesting accommodation in the future.

218. The retaliatory conduct had the effect of chilling the exercise of ADA rights by demonstrating that individuals who request accommodations will be subjected to additional scrutiny, pressure, denial, and continued adverse treatment.

219. As a direct and proximate result of Defendants' retaliation in violation of the ADA, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XIII
42 U.S.C. § 1983
VIOLATION OF SUBSTANTIVE DUE PROCESS
Conscience-Shocking Conduct
(Against Individual Defendants)

220. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

221. The Fourteenth Amendment's Due Process Clause prohibits conduct by government officials that "shocks the conscience."

222. Defendants' conduct shocks the conscience because it involved: (a) Interrogating a person who disclosed he was having a "mental health crisis"; (b) Deliberately exploiting a person's communication disability to obtain statements for use against him; (c) Denying medical intervention to a person who disclosed a medical crisis; (d) Using coercive tactics on a vulnerable individual unable to resist due to disability; (e) Manufacturing

probable cause through exploitation of disability; (f) Prioritizing obtaining incriminating statements over a person's immediate safety and medical needs; (g) Denying accommodation requests twice without any consideration; and (h) Having a medical professional witness all of this and do nothing.

223. The conscience-shocking nature of Defendants' conduct is demonstrated by the fact that even jail intake staff, after brief observation, recognized Plaintiff required medical section placement—yet CMPD officers and nurse, after hours with Plaintiff and explicit disclosure of crisis, took no medical action.

224. Defendants' conduct was not split-second decision-making under emergency circumstances, but rather deliberate choices made over hours to continue exploiting a vulnerable individual despite obvious red flags and explicit disclosures.

225. As a direct and proximate result of Defendants' conscience-shocking conduct in violation of substantive due process, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XIV
NEGLIGENT SUPERVISION
North Carolina State Tort
(Against City of Charlotte)

226. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

227. Under North Carolina law, an employer has a duty to exercise reasonable care in the supervision of its employees.

228. Defendant City of Charlotte had a duty to properly supervise its employees, including Detective Sussman, Detective Doe, Officer Campbell, Officer Latiolais, and Nurse Jane/John Doe.

229. This duty included: (a) Ensuring officers respond appropriately to accommodation requests; (b) Ensuring officers do not exploit individuals' disabilities; (c) Ensuring officers provide Miranda warnings during custodial interrogation; (d) Ensuring officers

recognize and respond to mental health crises; (e) Ensuring medical staff advocate for patient care over law enforcement goals; (f) Ensuring supervisors are available when requested; and (g) Reviewing and approving decisions to deny accommodation requests.

230. Defendant City of Charlotte breached its duty of supervision, as evidenced by:

(a) LACK OF RESPONSE TO SUPERVISOR REQUEST: Plaintiff explicitly requested to speak with a supervisor on two separate occasions. No supervisor ever responded to Plaintiff's requests. This demonstrates that supervisors were not monitoring subordinate officers' conduct and that no supervisory review of the decision to deny accommodation occurred.

(b) NO SUPERVISORY PROTOCOLS: Upon information and belief, the City of Charlotte had no protocol requiring supervisory review of ADA accommodation requests. Upon information and belief, the City of Charlotte had no protocol for supervisor response when requested by individuals with disabilities. Officers were allowed to deny accommodation requests without any supervisory oversight or approval.

(c) FAILURE TO MONITOR HIGH-RISK INTERROGATIONS: Interrogation of an individual in mental health crisis constitutes a high-risk situation requiring supervisory oversight. No supervisor monitored this interrogation. No supervisor reviewed tactics being used. Officers operated without oversight despite obvious risks.

(d) PATTERN OF VIOLATIONS: Multiple officers (Sussman, Doe, Campbell, Latiolais) all denied accommodations, and Nurse failed to intervene. This suggests systemic lack of supervision rather than isolated individual failure.

231. The fact that Plaintiff explicitly requested a supervisor on two occasions and none came demonstrates that Defendant City of Charlotte failed to maintain adequate supervisory systems and that supervisors were not available or responsive as required.

232. Defendant City of Charlotte's lack of supervision directly caused Plaintiff's injuries because proper supervision would have: (a) Required officers to provide Miranda warnings; (b) Required officers to accommodate disability; (c) Required officers to cease interrogation during medical crisis; (d) Required officers to contact mental health services; and (e) Prevented the constitutional violations that occurred.

233. As a direct and proximate result of Defendant City of Charlotte's negligent supervision, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XV
NEGLIGENT HIRING, TRAINING, AND RETENTION
North Carolina State Tort
(Against City of Charlotte)

234. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

235. Under North Carolina law, employers have a duty to exercise reasonable care in hiring, training, and retaining employees.

236. Defendant City of Charlotte breached this duty by failing to properly hire, train, and/or retain employees capable of: (a) Recognizing when individuals are in custody and Miranda warnings are required; (b) Understanding ADA requirements for reasonable accommodations; (c) Identifying and responding to mental health crises; (d) Handling interrogations of individuals with communication disabilities; and (e) Recognizing when to cease interrogation for medical/safety reasons.

NEGLIGENT TRAINING:

237. Defendant City of Charlotte's training failures are evidenced by the fact that multiple officers—Detective Sussman, Detective Doe, Officer Campbell, and Officer Latiolais—all failed to: (a) Provide Miranda warnings during custodial interrogation; (b) Recognize Plaintiff's obvious mental health crisis; (c) Understand their obligations under the ADA; (d) Respond appropriately to accommodation requests; and (e) Contact mental health crisis services when needed.

238. The fact that multiple officers all made the same fundamental errors demonstrates systemic training failure rather than isolated incidents.

239. Upon information and belief, Defendant City of Charlotte failed to provide adequate training on: (a) ADA Title II requirements for law enforcement; (b) Crisis Intervention Training (CIT) for mental health situations; (c) Recognizing and accommodating

communication disabilities; (d) Miranda requirements for custodial interrogations; (e) Appropriate responses to accommodation requests; (f) When to involve supervisors; and (g) Medical professionals' role in interrogation settings.

240. Defendant City of Charlotte's failure to train is particularly egregious given that: (a) The ADA has been law since 1990 (over 30 years); (b) Miranda has been law since 1966 (over 55 years); (c) These are fundamental, well-established legal requirements; and (d) Officers' ignorance of these basic requirements shows training failure.

NEGLIGENT RETENTION:

241. Upon information and belief, Detective Sussman, Detective Doe, Officer Campbell, and/or Officer Latiolais had prior instances of: (a) Civil rights complaints; (b) ADA violations; (c) Improper interrogation techniques; or (d) Failure to provide Miranda warnings.

242. Despite knowledge of prior problematic conduct, Defendant City of Charlotte retained these officers without remedial training or supervision.

243. Defendant City of Charlotte's negligent hiring, training, and retention directly caused Plaintiff's injuries because proper training would have prevented the constitutional violations that occurred.

244. As a direct and proximate result of Defendant City of Charlotte's negligent hiring, training, and retention, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XVI
PROFESSIONAL NEGLIGENCE / MEDICAL MALPRACTICE
North Carolina State Tort
(Against Defendant Nurse)

245. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

246. Defendant Nurse, as a Sexual Assault Nurse Examiner (SANE) and/or medical

professional employed by the City of Charlotte, owed Plaintiff a professional duty of care.

247. The standard of care for medical professionals in Defendant Nurse's position requires: (a) Assessment of patient's mental health status; (b) Recognition of mental health crisis and serious symptoms; (c) Advocacy for patient's medical needs over law enforcement goals; (d) Intervention when patient's health or safety is at risk; (e) Documentation of observable mental health symptoms; (f) Recommendation for mental health evaluation when warranted; and (g) Refusal to participate in procedures harmful to patient.

248. Defendant Nurse breached the professional standard of care by: (a) Failing to assess Plaintiff's mental health crisis; (b) Failing to intervene when Plaintiff disclosed mental health crisis; (c) Failing to advocate for cessation of interrogation; (d) Failing to recommend or facilitate mental health evaluation; (e) Remaining silent when Plaintiff requested accommodation; (f) Allowing law enforcement goals to override patient care; and (g) Participating in process that exacerbated Plaintiff's mental health crisis.

249. A reasonably prudent medical professional in Defendant Nurse's position would have: (a) Recognized Plaintiff's disclosed crisis as a medical emergency; (b) Advocated for immediate cessation of interrogation; (c) Contacted mental health crisis services; (d) Refused to continue rape kit examination until crisis addressed; and (e) Documented concerns and communicated to supervisors.

250. Defendant Nurse's breaches of professional duty directly caused or contributed to Plaintiff's injuries, including exacerbation of mental health crisis and subsequent suicide attempts.

251. As a direct and proximate result of Defendant Nurse's professional negligence, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XVII
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
North Carolina State Tort
(Against All Individual Defendants)

252. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

253. Under North Carolina law, intentional infliction of emotional distress requires: (a) Extreme and outrageous conduct; (b) Which is intended to cause and does cause; (c) Severe emotional distress.

254. Defendants' conduct was extreme and outrageous, including: (a) Deliberately exploiting a communication disability to obtain incriminating statements; (b) Using coercive tactics on a person in mental health crisis; (c) Interrogating someone who disclosed "mental health crisis" without medical intervention; (d) Denying accommodation requests twice without consideration; (e) Having medical professional witness crisis and do nothing; (f) Manufacturing probable cause through disability exploitation; and (g) Prioritizing statements over patient safety.

255. Defendants intended to cause or acted with reckless disregard for causing severe emotional distress by: (a) Knowing Plaintiff was in crisis and continuing anyway; (b) Knowing their tactics would worsen crisis; (c) Denying help Plaintiff explicitly requested; and (d) Continuing despite obvious psychological deterioration.

256. Defendants' conduct did cause severe emotional distress, evidenced by: (a) Multiple suicide attempts; (b) Psychiatric hospitalizations; (c) Ongoing intensive mental health treatment; (d) Severe exacerbation of mental health conditions; and (e) Permanent psychological trauma.

257. As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XVIII
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
North Carolina State Tort
(Against All Defendants)

258. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

259. Under North Carolina law, defendants may be liable for negligent infliction of emotional distress when their negligent conduct causes foreseeable severe emotional

distress.

260. Defendants owed Plaintiff a duty of care to conduct interrogations in a manner that did not create unreasonable risk of psychological harm.

261. Defendants breached this duty by the conduct described throughout this Complaint.

262. It was foreseeable that continuing to interrogate a person who disclosed "mental health crisis," denying accommodation requests, exploiting communication disability, and failing to provide medical intervention would cause severe emotional distress.

263. Defendants' breach of duty directly caused Plaintiff severe emotional distress as described above.

264. As a direct and proximate result of Defendants' negligent infliction of emotional distress, Plaintiff has suffered and continues to suffer damages as set forth below.

COUNT XIX
NEGLIGENCE / GROSS NEGLIGENCE
North Carolina State Tort
(Against All Defendants)

265. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

ORDINARY NEGLIGENCE:

266. Defendants owed Plaintiff a duty to exercise reasonable care in conducting interrogations, providing ADA accommodations, and responding to medical needs.

267. Defendants breached this duty through the conduct described throughout this Complaint.

268. Defendants' breach directly caused Plaintiff's injuries.

GROSS NEGLIGENCE:

269. Defendants' conduct constituted gross negligence under North Carolina law.

270. Gross negligence is wanton conduct done with conscious realization of the probability of injury to another and with reckless indifference to the consequences of that conduct.

271. Defendants' conduct was grossly negligent because:

(a) CONSCIOUS REALIZATION OF DANGER:
• Plaintiff explicitly disclosed mental health crisis
• Plaintiff explicitly requested accommodation
• Nurse observed and could document Plaintiff's crisis state
• Jail staff recognized crisis (placed in medical section)
• Defendants were consciously aware of substantial danger

(b) RECKLESS INDIFFERENCE TO CONSEQUENCES:
• Despite knowing of crisis, continued interrogation
• Despite two requests for supervisor, denied both
• Despite presence of nurse, never requested medical intervention
• Prioritized obtaining statements over Plaintiff's safety and life

(c) WANTON CONDUCT:
• Deliberately exploited communication disability
• Deliberately used coercive tactics on person in crisis
• Deliberately showed partial evidence to confused individual
• Deliberately arrested based on statements obtained through exploitation

272. Defendants' conduct went far beyond ordinary negligence and constituted willful or wanton conduct showing reckless disregard for Plaintiff's safety, health, and constitutional rights.

273. As a result of Defendants' gross negligence, Plaintiff is entitled to enhanced compensatory damages and punitive damages on his state tort claims.

274. As a direct and proximate result of Defendants' negligence and gross negligence, Plaintiff has suffered and continues to suffer damages as set forth below.

## V. SPOLIATION OF EVIDENCE AND REQUEST FOR ADVERSE INFERENCE

275. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

276. Plaintiff respectfully requests that this Court enter the following relief regarding the spoliation of evidence:

(a) Enter an adverse inference instruction permitting the jury to conclude that the complete message threads would have supported Plaintiff's version of events;

(b) Enter an adverse inference instruction permitting the jury to conclude that the complete message threads would have shown no criminal conduct occurred;

(c) Impose monetary sanctions on Defendants for spoliation;

(d) Award Plaintiff additional damages for the spoliation of evidence; and

(e) In the alternative, strike Defendants' answer or enter default judgment.

## VI. DAMAGES

277. As a direct and proximate result of Defendants' violations of Plaintiff's rights as set forth above, Plaintiff has suffered and continues to suffer the following damages:

ECONOMIC DAMAGES:

Past Medical Expenses:
• Ongoing mental health treatment (2024-2025): $50,000
• ACT team services: $40,000
• Medications: $10,000
SUBTOTAL: $100,000

Future Medical Expenses:
• Lifetime ACT team services (20 years): $200,000
• Ongoing psychiatric care: $150,000

• Medications: $50,000
SUBTOTAL: $400,000
Past Lost Wages:
• Lost employment at Professional Meters: $75,000
• Unable to work January 2024 – December 2025: $100,000
• Legal expenses and inability to work due to ongoing criminal prosecution: Included above
SUBTOTAL: $175,000

Front Pay (Future Lost Wages):
• Based on Average Weekly Wage $1,120.99 per week
• Annual earnings: $58,291
• 40 years lost earning capacity
• Present value: $2,331,640

Other Economic Damages:
• Transportation to treatment: $5,000
• Costs of accommodations and support services: $15,000
SUBTOTAL: $20,000

TOTAL ECONOMIC DAMAGES: $3,026,640

NON-ECONOMIC DAMAGES:

Pain and Suffering:
• Physical pain from suicide attempts: $200,000
• Ongoing psychological pain: $700,000
SUBTOTAL: $900,000

Mental Anguish and Emotional Distress:
• Trauma from interrogation: $300,000
• Fear and anxiety: $300,000
• Depression exacerbation: $300,000
SUBTOTAL: $900,000

Hedonic Damages (Loss of Enjoyment of Life):

- Fear and avoidance of law enforcement: $150,000
- Social withdrawal: $150,000
- Loss of independence (ACT team dependence): $200,000
- Inability to work or pursue career: $150,000
- Diminished quality of life: $200,000

SUBTOTAL: $850,000

Humiliation and Degradation:
- From arrest: $100,000
- From incarceration: $100,000
- From ongoing criminal prosecution: $100,000

SUBTOTAL: $300,000

Loss of Dignity and Autonomy: $200,000

Disruption of Life and Relationships: $200,000

Permanent Psychological Injury: $300,000

Conscious Pain and Suffering from Suicide Attempts: $180,175

TOTAL NON-ECONOMIC DAMAGES: $3,830,175

TOTAL COMPENSATORY DAMAGES (Economic + Non-Economic): $6,856,815

PUNITIVE DAMAGES:

278. Plaintiff requests punitive damages against the individual Defendants in their individual capacities.

279. Defendants' conduct was malicious, willful, wanton, and in reckless disregard of Plaintiff's rights.

280. The aggravating factors supporting substantial punitive damages include:

(a) EXTREME VULNERABILITY OF PLAINTIFF: Plaintiff was in acute mental health

crisis, had disclosed suicidal ideation (experienced but not disclosed to officers), had communication disability, was in custody and could not leave, and his vulnerability was known and exploited.

(b) ABUSE OF AUTHORITY AND POWER: Defendants held positions of authority as law enforcement and medical professional, used this authority to coerce statements, exploited power imbalance, and Plaintiff had no ability to resist or escape.

(c) DELIBERATE AND INTENTIONAL CONDUCT: Defendants deliberately continued interrogation after crisis disclosure, deliberately denied accommodation requests twice, deliberately used coercive tactics, deliberately showed partial evidence, and deliberately failed to contact mental health services.

(d) MULTIPLE ACTORS AND INSTITUTIONAL INDIFFERENCE: Six individual defendants involved shows institutional problem, multiple officers all denied accommodations shows policy, nurse present but took no action shows medical professional indifference, and no supervisor responded despite two requests shows supervisory indifference.

(e) CONSCIOUSNESS OF WRONGDOING: Plaintiff told Detective Sussman "they did something wrong," Detective's false/undocumented preservation request suggests cover-up, spoliation of complete messages shows destruction of evidence, and pattern of conduct suggests awareness of illegality.

(f) SEVERE AND FORESEEABLE HARM: Plaintiff disclosed mental health crisis so harm was foreseeable, Defendants continued conduct anyway showing reckless disregard, harm materialized exactly as foreseeable with suicide attempts, and harm continues to present day with ongoing trauma.

(g) DURATION AND REPETITION: Conduct continued for hours not momentary lapse, two separate denials of accommodation shows persistence, multiple interrogation sessions, and multiple officers participated.

(h) NO REMORSE OR CORRECTIVE ACTION: Upon information and belief, no officers disciplined, no policy changes made, no training provided, and criminal prosecution continues despite illegal interrogation.

(i) LIKELIHOOD OF RECURRENCE WITHOUT PUNISHMENT: Without punitive damages conduct likely to recur, the City of Charlotte has pattern of similar conduct upon information and belief, and deterrence necessary to protect future individuals with disabilities.

(j) REPREHENSIBILITY OF CONDUCT: Interrogating person in mental health crisis is highly reprehensible, exploiting disability is highly reprehensible, denying medical help to person in crisis is highly reprehensible, and manufacturing probable cause through exploitation is highly reprehensible.

281. Plaintiff requests punitive damages as follows:

ADA Claims (Subject to Combined Cap of $300,000):
• Punitive damages on ADA claims: $250,000
(Combined with compensatory, capped at $300,000 total under 42 U.S.C. § 1981a)

42 U.S.C. § 1983 Claims (NO CAP):
• Against each individual defendant on § 1983 claims: $3,000,000 total
(Divided among the six individual officer/nurse defendants)

State Tort Claims – Gross Negligence:
• Against City of Charlotte for negligent supervision: $500,000
• Against City of Charlotte for negligent hiring/training: $750,000
• Against Defendant Nurse for professional negligence: $500,000
• Against individual defendants for IIED: $500,000
• Against all defendants for gross negligence: $1,000,000

TOTAL PUNITIVE DAMAGES REQUESTED: $6,300,000

TOTAL DAMAGES REQUESTED:
• Compensatory Damages: $6,856,815
• Punitive Damages: $6,300,000
GRAND TOTAL: $13,156,815


VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendants on all counts;
B. Award Plaintiff compensatory damages in the amount of SIX MILLION, EIGHT HUNDRED FIFTY-SIX THOUSAND, EIGHT HUNDRED FIFTEEN DOLLARS ($6,856,815), consisting of:
• Economic damages: $3,026,640
• Non-economic damages: $3,830,175

C. Award Plaintiff punitive damages in the amount of SIX MILLION, THREE HUNDRED THOUSAND DOLLARS ($6,300,000);

D. Enter a declaratory judgment that Defendants' conduct violated:
1. The Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.
2. The Fourth Amendment to the United States Constitution
3. The Fifth Amendment to the United States Constitution
4. The Fourteenth Amendment to the United States Constitution
5. North Carolina state tort law

E. Issue permanent injunctive relief requiring Defendant City of Charlotte to: 1. Implement comprehensive ADA compliance training for all officers and staff 2. Establish written protocols for responding to accommodation requests 3. Ensure supervisory availability and require supervisory response when requested 4. Implement Crisis Intervention Training (CIT) for all officers
5. Establish protocols for recognizing and responding to mental health crises 6. Implement policies requiring cessation of interrogation when individual discloses mental health crisis pending medical evaluation
7. Provide training on recognizing and accommodating alogia and other communication disabilities
8. Establish protocols requiring documentation of all accommodation requests and denials
9. Train medical professionals on duty to advocate for patients over law enforcement goals
10. Implement supervisory review requirements for denial of accommodation requests

F. Issue adverse inference instructions regarding spoliation of evidence, specifically:

1. Instruction that the jury may infer complete message threads would have supported Plaintiff's version of events

2. Instruction that the jury may infer complete message threads would have shown no criminal conduct occurred

G. Impose monetary sanctions on Defendants for spoliation of evidence;

H. Award Plaintiff pre-judgment interest at the legal rate from January 21, 2024, to the date of judgment;

I. Award Plaintiff post-judgment interest at the legal rate;

J. Award Plaintiff costs of suit pursuant to 28 U.S.C. § 1920;

K. Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) and 42 U.S.C. § 12205;

L. Grant Plaintiff a trial by jury on all issues so triable; and

M. Grant such other and further relief as this Court deems just and proper.

VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this *16th* day of January , 2026

Dominique R. Jackson
Pro Se Plaintiff
3327 North Davidson street

Charlotte nc 29205
704-998-8936
dominiquejackson65@gmail.com
VERIFICATION

I, Dominique R. Jackson, hereby verify under penalty of perjury under the laws of the
United States that I have read the foregoing Complaint and that the facts stated therein
are true and correct to the best of my knowledge, information, and belief.

Executed on *16th* Janurary, 2026.


Dominique R. Jackson